Bryant, J.
On behalf of Mrs. Breeee, three errors are assigned, the third relating to the changes alleged to have been made in the final entry in the Probate Court to correct a clerical mistake. Counsel for Mrs. Breeee make no reference to this error in the brief filed on her behalf, from which we are forced to conclude that this claimed error has been abandoned by her, and it will accordingly be overruled without further discussion herein.
The first error assigned is in substance that the Court of Appeals erred in affirming the judgment of the Probate Court of Ross County for the reason that such judgment allegedly is “contrary to law, there being no evidence or insufficient evidence to sustain the judgment * * * the state of the evidence being such that reasonable minds could reach but one conclusion.” The second error assigned is in substance that the Court of Appeals erred in affirming the judgment of the Probate Court of Ross County for the reason that the court allegedly held ‘ ‘ that the presumption of continuing incompetency of appellant can be weighed as evidence as against substantial credible evidence introduced regarding the competency of appellant.”
We shall'consider the two claimed errors together. It must be borne in mind that this court is under no duty to weigh the evidence, but that it will in a proper case examine the record to determine the presence or absence of any credible evidence on material questions.
The proceedings in the Probate Court with reference to Mrs. Breeee were governed by Chapter 2111 of the Revised Code, relating to guardians. The first section in that chapter, Section 2111.01, in paragraph (D) and the paragraphs immediately following, provide separate and distinct definitions of the words, “incompetent,” “habitual drunkard,” “idiot,” “imbecile,” “insane,” “lunatic,” and “confined person.” It is clear in this case that all the proceedings involved solely the determina *546 tion of the question whether Mrs. Breece is competent or incompetent. The definition of an incompetent, therefore, is pertinent. Section 2111.01 (D), as in effect at the time of these proceedings, read as follows:
“(D) ‘Incompetent’ means any person who by reason of advanced age, improvidence, or mental or physical disability or infirmity, is incapable of taking proper care of himself or his property or fails to provide for his family or for other persons for whom he is charged by law to provide.”
As above indicated, the Probate Court on April 6, 1960, following the appointment hearing, made a finding and determination that Mrs. Breece “by reason of advanced age, mental and physical infirmity” was at that time “incompetent and incapable of taking proper care of herself and her property. ’ ’
The proceedings to terminate the guardianships, restore Mrs. Breece to competency and return to her the control of her property were governed by the provisions of Section 2111.47, Revised Code, and placed upon the ward the duty of producing “satisfactory proof that the necessity for the guardianship no longer exists.” When such proof is furnished, the court is under a mandatory duty to terminate the guardianships. Section 2111.47, as in effect at the time of these proceedings, provided, in part, as follows:
“Upon reasonable notice to the guardian and to the person on whose application the appointment was made, and upon satisfactory proof that the necessity for the guardianship no longer eodsts or that the letters of appointment were improperly issued, the Probate Court shall order that the guardianship of an incompetent, habitual drunkard, idiot, imbecile, lunatic, or confined person terminate and shall make an appropriate entry upon the journal. Thereupon the guardianship shall cease * * (Emphasis added.)
Counsel for Mrs. Breece have specifically stated that they make no issue whatsoever concerning the propriety of the original appointments under the order dated April 6, 1960, and it is clear that the sole issue before the Probate Court by virtue of the application of October 19,1960, to terminate the guardian-ships, considering the evidence offered at the termination hearing on October 31, 1960, was whether at such hearing there *547 was presented to the court “satisfactory proof that the necessity for the guardianship no longer exists.”
In view of the assertion on behalf of Mrs. Breece that the judgment of the Probate Court is contrary to law, and that allegedly there was “no evidence” to support such judgment or, in any event, evidence which was so “insufficient” “that reasonable minds could reach but one conclusion, ’ ’ that conclusion being contrary to the one reached by the Probate Court, we shall make reference to the evidence offered at the termination hearing.
As previously indicated, four witnesses were called on behalf of Mrs. Breece, and three of them were physicians who had been engaged for long periods of time in the general practice of medicine. It was stipulated and agreed by counsel for the two guardians that all three physicians called by Mrs. Breece were fully and completely qualified as such. Dr. Artman in 1960 served as president of the Ohio State Medical Association and Dr. E. M. Andre served as chief physician at the Atomic Energy Plant, Pike County, Ohio, until August, 1960. Dr. Mack E. Moore was engaged in the general practice of medicine for 24 years. The other witness was Marvin Stulley, the custodian of Mrs. Breece, in whose home she resided during the nearly seven months she was under guardianship.
The record shows that Dr. Artman attended Mrs. Breece in a consulting capacity along with Dr. Andre, her family physician for 30 years, during her stay in the Chillicothe Hospital in the period between March 21, 1960, when she fell and broke her right arm, and April 6, 1960, or thereabouts, when the guardian of her person was appointed and made the arrangements for her removal to the Stulley home.
Dr. Artman made a careful examination of Mrs. Breece in his office on October 14, 1960, with the object of determining her mental status as of that date. It was he who testified at the appointment hearing on April 4, 1960, that Mrs. Breece at that time suffered from malnutrition, arteriosclerosis and senile dementia. With reference to his findings on October 14, 1960, Dr. Artman testified at the termination hearing that she no longer was suffering from senile dementia and that she was competent. His testimony was as follows:
“Q. Now, Doctor, as a result of that observation and ex- *548 animation of October 14th of Mrs. Breece, do you have an opinion as to her competency? A. Yes, sir.
“Q. What is that opinion? A. As of the date I saw her on October the 14th, I felt that Mrs. Breece was competent; was aware of what was going on; was fairly aware of current events, and her current situation; and had a very excellent and clear memory of past events.”
Counsel for the guardians with the approval of the court cross-examined Dr. Artman apparently on the assumption that there is a difference in the standard for determining competency of the rich and of the poor. We know of no authority for such a distinction and none has been pointed out to us. One of the questions asked of Dr. Artman was whether Mrs. Breece “had the mental capacity and ability to handle an estate of considerable size?,” and, after the overruling of an objection to the question, Dr. Artman gave the following answer:
“A.- Well, I am not sure how you grade anybody on having the mental capacity to govern and manage an estate of considerable size. I am not even sure that I would be capable of managing an estate of considerable size. If it is put that way, I don’t know.”
As we view it, the only possible conclusion is that Dr. Art-man was of the opinion, without qualification or limitation, that Mrs. Breece no longer suffered from senile dementia, and that she was competent and capable of taking care of herself and her property.
The second witness called on behalf of Mrs. Breece was Dr. Andre, who, as has been stated above, had been her physician for 30 years, attended her during her stay in the Chillicothe Hospital and saw her frequently during the approximately seven months she was under guardianship. The record is not clear as to whether Dr. Andre testified at the appointment hearing, he merely stated that he was called, but there can be no doubt that he was of the opinion, both at the time of the appointment hearing and at the time of the termination hearing, that Mrs. Breece was not suffering from senile dementia, and that she was not incompetent but on the contrary was competent and capable of managing her property and taking care of herself. Testifying concerning an examination he made approximately *549 ten days prior to the termination hearing, Dr. Andre, at that hearing, testified on direct examination as follows:
££Q. (By Mr. McCurdy) Doctor, when you saw Mrs. Breece about, ten days ago, would you tell the court what kind of an examination you conducted of Mrs. Breece? A. I gave her a physical examination and I examined her heart. I talked with her and got a history from her. I got her blood pressure and it was just a general examination. Knowing her past history of past diseases and her family history, I did not go into that, but I did make a physical examination.
££Q. Did you talk with her generally at that time, Doctor? A. I did.
££Q. Doctor, as a result of that examination and your prior knowledge and treatment of this woman, do you have an opinion as to her competency? A. I do have.
££Q. What is that opinion? A. I think she was competent. In my opinion she was competent.
££Q. And that was at the period of your last examination ten days ago? A. It was, yes.”
There can be no question that Dr. Andre disagreed with the conclusion reached by Dr. Artman in March 1960 that Mrs. Breece was then incompetent, and that, as a family physician for approximately 30 years, Dr. Andre did not believe that she was suffering from senile dementia at the time of the appointment hearing. Under cross-examination, Dr. Andre testified as follows:
££Q. Now, you examined Mrs. Breece when we had our first hearing here in March, isn’t that right, Doctor? A. Yes, sir.
££Q. Clinically, what would Mrs. Breece’s condition be at that time? A. Well, you know at that time she had a fractured arm.
££Q. Yes. A. She was very — somewhat confused at that time. She was still in the hospital, as you will recall, when her first hearing was held.
£ £ Q. What was her condition as far as arteriosclerosis and senile dementia was concerned, Doctor? A. She has some arteriosclerosis which would be the normal finding in one her age. Her mental condition was such that she knew me. She knew where she was. She knew what had happened. She was very anxious to get out of the hospital. She was irritable at that *550 time because of her confinement in the hospital. Aside from that, I think she was competent.
“Q. No, you didn’t answer my question, Doctor. Did she have senile dementia at that time ? A. In my opinion she did not have senile dementia.
“Q. She did not have senile dementia? A. She did not have at that time.”
The third witness called by Mrs. Breece was Dr. Moore who testified that he had seen her professionally six times in the period between August 17, 1960, and October 19, 1960, and that he gave her an examination and arrived at the conclusion that she was competent. His testimony was, in part, as follows:
“Q. Now, on the 19th of October, what was the scope of your examination? What did you do? What did you look for? A. Well, that included her history as to the interval since she had last been seen, her complaints, her blood pressure, her heart, and weight, and the presence of any edema or fluid retentions, that is about all I believe.
“Q. Now, in the course of your examination have you had occasion to ascertain her family history and background and discuss affairs generally with her? A. Generally, yes.
“Q. Have you had occasion to discuss or hear her discuss her family affairs and background and relationships? A. Very little. I had the opportunity but we didn’t go into that in detail.
‘ ‘ Q. Have you observed in the course of your examinations her mental condition? A. Yes, sir, I have.
“Q. Now, as a result of your examinations, do you have an opinion as to the competency of Nellie B. Breece? A. Yes, I have.
“Q. What is that opinion? A. Since I have had her under observation since August, I think she is quite competent.”
Marvin Stulley, the fourth and final witness called by Mrs. Breece, testified that he had known her for 31 years, that she had resided in the Stulley home for nearly seven months, and that she made her own bed, dressed herself, did her own laundry and ironing and did not require specialized care of any kind. He testified further that she helped with the preparation of food and the washing of dishes, and that she took part in the family discussions in the Stulley home. Based upon the close and detailed observation available to him as custodian of Mrs. Breece, *551 he expressed the opinion that she, at the time of the termination hearing, was both normal and competent. His testimony was as follows:
“Yes, the question was do you have an opinion as to her competency and you can answer that question yes or no.
“Yes.
“Q. (By Mr. McCurdy) What is that opinion? A. Well, I think she is a very normal and a very competent person myself. ’ ’
As hereinbefore pointed out, the only other witness to testify was the trust officer of the corporate guardian of the estate of Mrs. Breece, and the most that can be said for his testimony is that it tended to support the reasonableness of the court’s order of April 6,1960, in making the original appointments. He testified that the records of Mrs. Breece, at the time of the original appointment, were confused, that there were a number of tax delinquencies, that a house owned by her and located in Albuquerque, New Mexico, was allowed to fall into a state of disrepair and was damaged by vandals, and that he had obtained court authority to sell it.
His testimony with reference to the two or three visits which Mrs. Breece made to his office indicated that she was concerned as to the whereabouts of securities owned by her and with reference to jewelry belonging to her, particularly with reference to a valuable diamond ring, from which testimony it would seem reasonable to infer that, to that extent, her reactions were that of the average person.
Although a period of 12 days elapsed between the time of the filing of the application to terminate the guardianships and the date of the hearing thereon, it does not appear from the record that the guardian of the person of Mrs. Breece took any steps to have her examined by a physician, a psychiatrist or anyone else chosen by him. It also appears that Mrs. Breece was physically present in the courtroom at the time of the termination hearing on October 31, 1960, but that neither guardian made any effort to obtain her testimony.
In the decision of the Probate Court announced on January 9, 1961, pursuant to the request of counsel for Mrs. Breece, the court set forth 12 findings of fact and 13 conclusions of law, but, for the purposes of this appeal, it will be necessary to refer only *552 to No. 8 and No. 9 of the findings of fact and No. 7 and No. 11 of the conclusions of law.
The eighth and ninth findings of fact are as follows:
“8. that there is insufficient evidence of probative value to indicate that her mental condition has changed since the original finding of the court that she was mentally incompetent and unable to properly care for herself and her property;
“9. that the opinions of the witnesses as to competency of ward are not based upon such observation or examination as to make them credible. ’ ’
The seventh and the eleventh conclusions of law are as follows:
“7. that the opinions of the witnesses that Nellie B. Breece was competent were not founded upon sufficient observations or facts and circumstances within the knowledge of such witnesses and testified to in court, to indicate that Nellie B. Breece was capable of taking proper care of herself;
i i # * #
“11. that the opinions of the witnesses that Nellie B. Breece was competent were not founded upon sufficient observations or facts and circumstances within the knowledge of such witnesses and testified to in court, to indicate that Nellie B. Breece was capable of taking proper care of her property. ’ ’
From an examination of the entire opinion of the Probate Court, the findings of fact and conclusions of law at the end thereof and the comments made by the court during the progress of the termination hearing, it is clear that the court, for the purpose of its decision of the case, treated the testimony of the three physicians and Stulley as though they had not appeared and testified at all. The effect was the same as that which would have followed in a case where a jury was trying an issue of fact and the court found the witnesses totally lacking in any qualification and refused to permit them even to testify.
This is somewhat puzzling in view of the apparent fact that Dr. Artman, at the time of the original appointment hearing on April 4, 1960, at which time he was of the opinion that Mrs. Breece was incompetent, apparently was regarded as being a competent witness, but the same physician, less than seven months later, appears to have been regarded as totally incompetent so that' his testimony that Mrs. Breece, as of the time of *553 the termination hearing, was restored to competency was not worthy of any consideration whatsoever.
It would seem that Dr. Artman’s observation and treatment of Mrs. Breece during the period she was confined to the Chillicothe Hospital, in the ordinary course of events, would have provided an excellent foundation for a comparison with her condition as he found it at the time of his examination shortly before the time of the termination hearing. It would also seem that the information and observations made by Dr. Andre during the more than 30 years in which Mrs. Breece had been his patient should have provided another excellent foundation upon which to form an opinion based upon his latest examination of her, shortly before the termination hearing. The six professional visits of Mrs. Breece to Dr. Moore should have given him a proper foundation upon which to base an opinion from the facts gained at the time of the special mental examination given by him, also shortly before the termination hearing. It is hardly open to question that Stulley, by virtue of 31 years acquaintanceship with Mrs. Breece and the close association during the nearly seven months prior to the termination hearing, should have had a good factual background upon which to base the opinion which he expressed at the time of the termination hearing.
As hereinbefore pointed out, the sole issue at the termination hearing was whether Mrs. Breece had presented to the court, pursuant to the provisions of Section 2111.47, supra, “satisfactory proof that the necessity for the guardianship no longer exists.” The court held that the determination made by it on April 6, 1960, when Mrs. Breece was found to be incompetent, raised a presumption that she continued to be incompetent, and the court by a further disqualification of all the witnesses offered on behalf of Mrs. Breece determined that such presumption had not been overcome by sufficient evidence. The fact is that- the rules as applied by the Probate Court left the record about the same as it would have been had no witnesses been called on behalf of Mrs. Breece, and hence the record would have contained no evidence.
In our opinion the presumption of continued incompetency is a rebuttable presumption, often referred to where there is an absence of evidence. In the case of Ayres v. Woodard, Sheriff *554 (1957), 166 Ohio St., 138, the third paragraph of the syllabus reads in part as follows:
“3. A presumption is a procedural device which is resorted to only in the absence of evidence by the party in whose favor a presumption would otherwise operate * * V’
In the course of the opinion by Matthias, J., at page 144, it is said as follows:
“In the instant action we do not reach that point where the Fieback and Deal cases would enter our reasoning since ‘presumptions are indulged in only to supply facts.’ ‘Presumptions must be based on some necessity. Courts will not go into the domain of presumptions where direct proof can be obtained. ’ 31 Corpus Juris Secundum, 723, 724, and cases cited.
“In the case of Hanna v. McClave, 271 Mich., 133, 141, 260 N. W., 138, the court said:
“ ‘The presumption, however, exists only in the absence of evidence, and does not serve at all when the issue * * * is tried out upon evidence.’ (Emphasis added.) See, also, Patt v. Dilley, 273 Mich., 601, 263 N. W., 749.”
That the statement above quoted is the general rule may be seen by reference to 20 American Jurisprudence, 163, Evidence, Section 158, in which it is stated as follows:
“But a presumption will never be construed or defined in such a manner as to extend its application beyond the realm of reasonable probability or certitude. Accordingly, courts will not define presumptions in such manner as to imply superiority over established facts. Where facts appear, presumptions recede. Thus, the necessity for resorting to presumptions disappears when there is direct and positive evidence upon the matter in issued’ (Emphasis added.)
In 20 American Jurisprudence, 164, Evidence, Section 160, it is stated:
“Most presumptions must give way when in conflict with facts which have been established by proof. Stated differently, a presumption is rebutted when facts to the contrary are established.”
It appears that in Ohio the one against whom a presumption arises needs only produce “just enough evidence to counterbalance the presumption.” In the case of In re Estate of *555 Walker (1954), 161 Ohio St., 564, Stewart, J., in the course of the opinion at page 568, said:
“It has been consistently held by this court that, ordinarily, in the case of a presumption, the one against whom the presumption arises needs only to produce just enough evidence to counterbalance the presumption. Klunk v. Hocking Valley Ry. Co., 74 Ohio St., 125, 77 N. E., 752.”
Where the presumption is a rebuttable one, as in this case, the production of evidence disputing or contrary to the presumption causes the presumption to disappear where such evidence to the contrary either counterbalances the presumption or even when it is only sufficient to leave the case in equipoise. In the case of Carson v. Metropolitan Life Ins. Co. (1951), 156 Ohio St., 104, Stewart, J., in the course of the opinion at page 108, wrote as follows:
“The presumption is a rebuttable one and disappears upon the production of evidence to the contrary, which counterbalances it or leaves the case in equipoise. Brunny, Admx., v. Prudential Ins. Co. of America, 151 Ohio St., 86, 84 N. E. (2d), 504.”
In the Brunny case, decided in 1949, in the opinion by Zimmerman, J., at pages 92 to 94, inclusive, there is a review of the function of presumptions, the statement is made that presumptions may supply the want of facts but they cannot stand against positive facts, and, in the course of the opinion, beginning at page 92, appears the following:
“A ‘presumption’ has been defined as ‘a rule which the law makes upon a given state of facts.’ Ensel v. Lumber Ins. Co. of New York, 88 Ohio St., 269, 282, 102 N. E., 955, 959; Glowacki, a Minor, v. North Western Ohio Ry. & Power Co., 116 Ohio St., 451, 459, 157 N. E., 21, 23, 53 A. L. R., 1486, 1490.
lift * #
‘ ‘ Thus a party against whom a presumption is invoked, removes its effect when he produces rebutting evidence of a character which leaves the evidence as a whole in such a state that it cannot reasonably be said that the presumption should prevail over the evidence offered to destroy it.
“Presumptions may supply the want of facts, but they cannot stand against positive facts. Wallace’s Lessee v. Miner, 6 Ohio, 366, 370. Compare 16 American Jurisprudence, 23, Section 24. ”
*556 In the case of Shepherd v. Midland Mutual Life Ins. Co. (1949), 152 Ohio St., 6, Hart, J., in the course of the opinion at page 25, wrote as follows :
“By the great weight of authority a presumption of law, as is the one before us in this case, is not evidence nor to be applied as evidence. * * * But if the party against whom the presumption operates does produce what the court deems to be substantial or, as some courts say, any evidence to the contrary as to the means causing death, the presumption disappears as a rule of law and the case must be disposed of as to the issue of means of causing death on the facts produced, independently and without reference to any presumption, to be determined under the burden of proof and on the weight of the evidence as though no presumption had ever existed.” (Emphasis added.)
Under the application to terminate the two guardianships filed October 19, 1960, and heard on October 31, 1960, the issue arising under the provisions of Section 2111.47, supra, was whether Mrs. Breeee offered “satisfactory proof that the necessity for the guardianship no longer exists.” The language used recognizes the probability or likelihood that the necessity existed at the time the appointment was made. It also recognizes the fact that conditions may change and the necessity may no longer exist.
It is clear from an examination of the record in this ease that, except for the presumption arising from the determination of the Probate Court on April 6, 1960, that Mrs. Breeee was at that time incompetent and that such incompetency continued, there is no evidence of any kind or character in the record that she was incompetent in October 1960. On the contrary, there was uncontradicted testimony of a high order that Mrs. Breeee no longer suffered from senile dementia, that she was rational and oriented, and that she was competent to take care of herself and her property, from which it follows that, in face of such testimony, the presumption disappeared from the case, and the undisputed testimony being that Mrs. Breeee is presently competent, the Probate Court was under a mandatory duty to order the guardianships terminated.
We conclude that there was an absence of any evidence to sustain the judgment of the Probate Court but, on the other hand, that the evidence was undisputed that the necessity for *557 the guardianships no longer existed, that in this ease the presumption of continuing incompetency simply disappeared in face of positive, substantial and overwhelming testimony to the contrary, and that the first and second errors assigned are well taken and must be sustained.
The judgment of the Court of Appeals is reversed, and the cause is remanded to the Probate Court for further proceedings in accordance with this opinion.

Judgment reversed.

Weygandt, C. J., Zimmerman, Taet, Matthias, Bell and O’Neill, JJ., concur.
Bryant, J., of the Tenth Appellate District, sitting by designation in the place and stead of Herbert, J.-